Slip Op. 12-86

UNITED STATES COURT OF INTERNATIONAL TRADE

THAI PLASTIC BAGS INDUSTRIES CO.,
LTD., POLYETHYLENE RETAIL CARRIER
BAG COMMITTEE, HILEX POLY CO.,
LLC, and SUPERBAG CORPORATION,

               Plaintiffs,

        v.

UNITED STATES,

               Defendant.

Before: Donald C. Pogue,
       Chief Judge

Consol.[1] Court No. 11-00086

**Public Version**

OPINION

[Plaintiffs' motion for judgment on the agency record GRANTED in
part and DENIED in part].

Dated: June 18, 2012

Irene H. Chen, Cen Law Group LLC, of Rockville, MD, and
Mark B. Lehnardt, Lehnardt & Lehnardt LLC, of Liberty, MO, for
Plaintiff.

Joseph W. Dorn, Stephen A. Jones, and Daniel L.
Schneiderman, King & Spalding, of Washington, DC, for
Consolidated Plaintiffs.

Vincent D. Phillips, Trial Attorney, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice, of

---

[1] This action is consolidated with Court Nos. 11-00086 and
11-00090.

Washington, DC, for Defendant. With him on brief were <u>Stuart F. Delery</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant Director. Of counsel on the brief was <u>Scott D. McBride</u>, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

**Pogue, Chief Judge:** In this action, Plaintiff Thai Plastic Bags Industries Co., Ltd. ("TPBI"), a producer of polyethylene retail carrier bags ("PRCBs") from Thailand, the subject merchandise, and Plaintiffs Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation (collectively "PRCBC"), producers of a domestic like product, each challenge determinations made by the United States Department of Commerce ("Commerce" or "the Department") in the fifth administrative review of the antidumping ("AD") order on PRCBs.[2]

Specifically, Plaintiffs challenge: 1) Commerce's adjustments to TPBI's reported cost allocation methodology; 2) Commerce's use of zeroing; 3) Commerce's cost adjustment, under the transactions disregarded rule, for linear low density resin ("LLD") obtained by TPBI; and 4) Commerce's determination that

---

[2] <u>See</u> <u>Polyethylene Retail Carrier Bags From Thailand</u>, 76 Fed. Reg. 12,700 (Dep't Commerce Mar. 8, 2011) (final results of antidumping duty administrative review) ("<u>Final Results</u>"), and accompanying Issues & Decision Memorandum, A-549-821, ARP 08-09 (Mar. 1, 2011) Admin. R. Pub. Doc. 136, <u>available at</u> http://ia.ita.doc.gov/frn/summary/THAILAND/2011-5267-1.pdf (last visited June 15, 2012) ("<u>I & D Mem.</u>") (adopted in <u>Final Results</u>, 76 Fed. Reg. at 12,701). The period of review ("POR") was August 1, 2008 through July 31, 2009.

TPBI's 2009 inventory valuation losses were attributable to finished goods inventory and were therefore excluded from the calculation of TPBI's general and administrative expenses for producing its goods.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).

For the reasons discussed below, issues two and three are remanded to Commerce for reconsideration and further explanation; Commerce's determinations on issues one and four are affirmed.


**STANDARD OF REVIEW**

Under its familiar standard of review, the court will sustain Commerce's determinations if they are "supported by substantial evidence on the record," and "otherwise . . . in accordance with law." See Section 516A(b)(1)(B)(I) of the Tariff Act of 1930, 19 U.S.C. § 1516a(b)(1)(B)(I) (2006).[3]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938), "taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." Atl. Sugar, Ltd. v. United

---

[3] Further citations to the Tariff Act of 1930 are to Title 19 of the United States Code, 2006.

States, 744 F.2d 1556, 1562 (Fed. Cir. 1984); see also Universal

Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  Thus, the

substantial evidence standard of review "can be translated

roughly to mean 'is [the determination] unreasonable?'" Nippon

Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir.

2006) (quoting SSIH Equip. SA v. U.S. ITC, 718 F.2d 365, 381

(Fed. Cir. 1983)).


**DISCUSSION**

I.        TPBI Issue 1: Reallocation of TPBI's Reported Costs

          Commerce, during an administrative review, determines

whether subject merchandise has been sold at less than fair

value, or "dumped," in the United States.  To do so, the

Department endeavors to make a fair comparison between the export

price or constructed export price of a foreign producer's sales

and its "normal" or home market sale value. See 19 U.S.C.

§ 1677b(a); 19 U.S.C. § 1677(35)(A).[4]  This determination

requires that Commerce compare products sold in the United States

to matching "like" products sold in the home market. See 19

U.S.C. § 1677b(a)(1)(B). See also 19 U.S.C. § 1677(16); Uruguay

Round Agreements Act, Statement of Administrative Action, H.R.

Doc. No. 103-316, vol. 1, at 820 (1994) ("SAA"), reprinted in

---

          [4] "Normal value" is "the price at which the foreign like
product is first sold . . . for consumption in the exporting
country . . . ." 19 U.S.C. § 1677b(a)(1)(B)(I).

1994 U.S.C.C.A.N. 4040, 4161 ("[T]he preferred method for

identifying and measuring dumping is to compare home market sales

of the foreign like product to export sales to the United

States.")  In its comparison, Commerce may, under certain

conditions, disregard sales below the producer's cost of

production ("COP").[5] 19 U.S.C. § 1677b(b).

   To the extent that not all products have an identical

match, Commerce, in accordance with the statute, may calculate a

constructed value ("CV") of the merchandise.  Commerce uses the

same method to calculate "costs" for both COP and CV. Compare 19

U.S.C. § 1677b(b)(3), with 19 U.S.C. § 1677b(e). See also 19

---

[5] 3) Calculation of cost of production

For purposes of this part, the cost of production shall
be an amount equal to the sum of—

   (A) the cost of materials and of fabrication or
   other processing of any kind employed in producing
   the foreign like product, during a period which
   would ordinarily permit the production of that
   foreign like product in the ordinary course of
   business;

   (B) an amount for selling, general, and
   administrative ["SG&A"] expenses based on actual
   data pertaining to production and sales of the
   foreign like product by the exporter in question;
   and

   (C) the cost of all containers and coverings of
   whatever nature, and all other expenses incidental
   to placing the foreign like product in condition
   packed ready for shipment.

19 U.S.C. § 1677b(b)(3).

U.S.C. § 1677b(f).  To make its CV and COP determinations,

Commerce must consider all available evidence regarding proper

cost allocation, 19 U.S.C. § 1677b(f)(1)(A), including costs as

reported by the foreign producer.  Such costs will, normally, be

calculated based on the producer's records, if the records are

kept in accordance with the generally accepted accounting

principles ("GAAP") of the exporting country and if such records

reasonably reflect the costs associated with the production and

sale of the merchandise. 19 U.S.C. § 1677b(f)(1)(A); I & D Mem.

Cmt. 1 at 9.

     In addition, in calculating the normal value, Commerce

may make reasonable allowances for differences in physical

characteristics of the merchandise (its "DIFMER" adjustment).[6]

     As Commerce must calculate the COP and CV with as much

accuracy as possible, if the company's reported cost allocation

methodology shifts costs away from the subject merchandise or the

foreign like product, Commerce has the authority to adjust costs

to ensure that they are not artificially reduced. Thai Plastic

---

[6] Reasonable allowance. In deciding what is a
reasonable allowance for differences in physical
characteristics, the Secretary will consider only
differences in variable costs associated with the
physical differences. Where appropriate, the Secretary
may also consider differences in the market value. The
Secretary will not consider differences in cost of
production when compared merchandise has identical
physical characteristics.

19 C.F.R. § 351.411(b).

Bags Indus. Co. v. United States, 34 CIT __, 752 F. Supp. 2d

1316, 1324 (2010)("Thai Plastic Bags I"); See SAA at 834-35, 1994

U.S.C.C.A.N. at 4171-72; 19 C.F.R. 351.407(c).[7]

Specifically, in the fifth administrative review of this

order, just as in the fourth administrative review, Commerce

concluded that TPBI's reported cost allocation "resulted in

product-specific cost differences which were unrelated to

differences in physical characteristics." Thai Plastic Bags I, 34

CIT __, 752 F. Supp. 2d at 1329; Resp. Br. of PRCBC in Opp'n to

TPBI's Mot. for J. on Agency R. at 7, ECF No. 74 ("PRCBC's Resp.

Br."). These differences were the result of TPBI's adjustment of

its reported "conversion costs." TPBI alleges that these

adjustments were to reflect the additional time needed to process

different products. Pl.'s Rule 56.2 Mem. of Law in Supp. Of Mot.

for J. on Agency R., ECF No. 50-1, at 15 ("TPBI's Br.). But

Commerce determined that TPBI's submitted evidence showed that

TPBI's reported cost allocation methodology did not reasonably

reflect the actual costs for producing the merchandise, Def.'s

Resp. in Opp. to Pls.' Rule 56.2 Mot. for J. upon the Agency R.,

---

[7] Allocation of costs. In determining the appropriate
method for allocating costs among products, the
Secretary may take into account production quantities,
relative sales values, and other quantitative and
qualitative factors associated with the manufacture and
sale of the subject merchandise and the foreign like
product.

19 C.F.R. § 351.407(c).

ECF No. 67, at 14 ("Def.'s Br."), and that TPBI's reporting

methodology unreasonably distorted the cost of manufacture

("COM").[8] <u>Polyethylene Retail Carrier Bags From Thailand</u>, 75 Fed.

Reg. 53,953, 53,955 (Dep't Commerce Sept. 2, 2010) (preliminary

results of antidumping duty administrative review) ("<u>Prelim.

Results</u>").

    In particular, Commerce found that TPBI's reporting

methodology was inconsistent with its normal cost-accounting

practice and the reported cost differences were unrelated to

physical differences. <u>Id.</u>  Commerce found that TPBI did not

actually use its reported cost allocation methodologies in its

normal books and records, but rather created a methodology

outside of its normal business practices to report labor and

overhead costs to Commerce. Def.'s Br. at 14-15; <u>I & D Mem.</u>

Cmt. 1 at 10.  Accordingly, Commerce reallocated TPBI's reported

conversion costs.[9]

    TPBI argued that its cost allocation method reflected

cost differences attributable to physical characteristics; but

---

[8] Cost of Manufacturing ("COM") includes the direct
materials, direct labor, variable manufacturing overhead, and
fixed manufacturing overhead costs incurred in the production of
the merchandise.  <u>See</u> Antidumping Manual, Chapter 9 at 5 ("AD
Manual"), <u>available at</u> http://ia.ita.doc.gov/admanual/index.html
(last visited June 15, 2012).

[9] In doing so, Commerce calculated the sum of direct labor,
variable overhead, and fixed overhead, and applied a weighted
average of these amounts. <u>See</u> <u>Final Results</u>, 76 Fed. Reg. at
12,701; <u>I & D Mem.</u> Cmt. 1 at 12.

Commerce found that TPBI's method resulted in "great variability" in costs for similar items having nothing to do with physical characteristics. Def.'s Br. at 15; Prelim. Results 75 Fed. Reg. at 53,955.  Specifically, Commerce looked at nine pairs of CONNUMs[10] that were very similar physically and found that under TPBI's allocations, these items had very different costs. I & D Mem. Cmt. 1 at 8.

Even though TPBI explained that many variables other than physical characteristics affected costs, Commerce found that most of the CONNUM pairs were produced in the same facility and had very slight physical differences, yet there were extreme differences in production times reported. I & D Mem. Cmt. 1 at 8; Def.'s Br. at 16.  Commerce then determined that the record showed that TPBI's cost allocation methods did not reasonably reflect actual costs because such cost disparities were not explained by physical differences in the specific products. Def.'s Br. at 16.  Commerce thus relied on actual data reported by TPBI and weight-averaged the costs across all production lines. Def.'s Br. at 17; I & D Mem. Cmt. 1 at 12.

TPBI now challenges Commerce's decision to replace TPBI's reported costs with Commerce's average cost calculation. TPBI's Br. at 13.  TPBI states that Commerce should have accepted

---

[10] A CONNUM is a control number variable Commerce uses in matching transactions. I & D Mem. at 2.

TPBI's reported costs as in accordance with GAAP principles, that

Commerce incorrectly relied on the DIFMER standard in

reallocating TPBI's costs and that Commerce should have used

TPBI's cost information in its calculations. See id. at 14.

However, as explained below, Commerce reasonably decided A) not

to use TPBI's cost methodology; B) to utilize the DIFMER

standard; and C) to reject TPBI's alternate cost methodologies.

### A.   Costs

TPBI first argues that Commerce's decision to replace

TPBI's reported costs with averaged costs is not supported by

substantial evidence. TPBI's Br. at 13.  But in its normal

accounting system, TPBI calculates a single monthly per-kilogram

average conversion cost for all products based on the costs and

quantities from the previous three months. See TPBI's Section D

Resp., A-549-821, ARP 08-09 (Dec. 16, 2009), Admin. R. Con. Doc.

7 [Pub. Doc. 40] at D-14.  Contrary to this normal practice, in

reporting its costs for this administrative review, TPBI used a

different reporting methodology. See id. at D-15.  TPBI allocated

conversion costs to individual models based on production hours.

Id. at D-26 to D-28.  Commerce rejected TPBI's allocation as

distortive because it shifted costs away from the subject

merchandise. Def.'s Br. at 16. See I & D. Mem. Cmt. 1 at 9.

Disputing Commerce's conclusion, TPBI maintains that

its cost allocation is a reasonable reflection of production and

sale costs of the subject merchandise. TPBI's Br. at 15.  TPBI

claims that although its costs were based on actual costs, that

other variables besides physical characteristics affected the

costs. Def.'s Br. Ex. G at S5D-20 to S5D-22; Def.'s Br. at 15;

TPBI's Br. at 7; TPBI Case Br., A-549-821, ARP 08-09 (Dec. 10,

2010), Admin. R. Con. Doc. 42 [Pub. Doc. 128] at 13.  TPBI states

that Commerce should have reviewed those cost driving factors

(such as material inputs, order sizes, complexity of bags)

instead of relying on a sampling of nine CONNUM pairs to conclude

that there are factors other than physical characteristics that

drove cost differences. See TPBI's Br. at 18.

        But it was not unreasonable for Commerce to conclude

that TPBI's methodology produces "great variability" in the costs

of similar items having nothing to do with the physical aspects

of the specific product. Def.'s Br. at 15; Prelim. Results, 75

Fed. Reg. at 53,955.  Specifically, in considering the nine pairs

of CONNUMs that were very similar physically, Commerce found that

under TPBI's reported cost allocations these items had very

different costs. I & D Mem. Cmt. 1 at 8; Def.'s Br. at 15.

        Commerce correctly notes that most of the CONNUM pairs

were made at the same facility and that the evidence illustrated

that slight physical differences could not account for actual

cost differences because the disparities could not be explained

by these physical differences in the products. Def.'s Br. at 16;

I & D Mem. Cmt. 1 at 8.  Moreover, TPBI was unable to provide
Commerce with its actual labor and overhead costs because its
financial accounting system does not maintain such costs at a
CONNUM specific level. Def.'s Br. at 5, 14.

As TPBI's reporting methodology deviated from its
normal accounting practice, Commerce adjusted the reported costs
to ensure that they were not artificially reduced and distortive
of true costs. I & D Mem. Cmt. 1 at 9;Def.'s Br. at 16. See also
SAA at 835; Thai Pineapple Pub. Co. v. United States, 187 F.3d
1362, 1366 (Fed. Cir. 1999);  Hynix Semiconductor, Inc. v. United
States, 424 F.3d 1363, 1369 (Fed. Cir. 2005) (quoting Am. Silicon
Techs. v. United States, 261 F.3d 1371, 1377 (Fed. Cir. 2001)).
Plaintiff's reported per-unit costs shifted costs away from the
subject merchandise, and thus Commerce reasonably recalculated
Plaintiff's costs by averaging them in order to prevent large
discrepancies in costs between merchandise that was physically
similar. Def.'s Br. at 17; I & D Mem. Cmt. 1 at 12.

**B.   DIFMER**

In calculating normal value, Commerce utilizes a DIFMER
standard – i.e., a "difference in physical characteristics" or
"difference-in-merchandise" adjustment –  in its review of what
constitutes a reasonable allowance for differences in the
physical characteristics of products sold in the U.S. and in
foreign markets. See 19 C.F.R. § 351.411(b).  Commerce also has a

practice of comparing cost allocations using physical

characteristics of the product in its determination of whether a

company's cost allocation strategy reasonably reflects actual

costs. Def.'s Br. at 18.

     In the Final Results Commerce stated that it considered

physical differences in its cost analysis because these

differences ultimately affect price. Def.'s Br. at 20.  Commerce

argues that it analyzes subject merchandise costs by using

physical characteristics because this is a dependable way to

compare the different products, and that cost comparisons

utilizing physical characteristics are "key" to Commerce's

analysis. Def.'s Br. at 18; Prelim. Cost Mem. For TPBI, A-549-

821, ARP 08-09 (Aug. 26, 2010), Admin. R. Con. Doc. 36 [Pub. Doc.

105] at 2 ("Prelim. Cost Mem."); Def.'s Br. Ex. I at 2.

     TPBI challenges Commerce's reliance on its physical

differences, or DIFMER, analysis. TPBI's Br. at 23-24.  TPBI

argues that the DIFMER standard is not appropriate here, as it

was intended for use in the context of price adjustments to

normal value when there are variable cost differences between

non-identical foreign like products and the subject merchandise.

TPBI's Br. at 24.

     TPBI argues that Commerce misapplied the DIFMER

standard both in improperly weight-averaging conversion cost

differences across all products and by calculating the DIFMER

adjustment to normal value based solely on cost differences in

materials (because the DIFMER standard is not to be used for cost

differences unrelated to physical differences). TPBI's Br. at 26-

27.

    However TPBI did not offer any meaningful evidence to

explain why physical differences in the CONNUM pairs resulted in

such large differences in conversion costs.  As cost allocation

based on physical characteristics is a primary factor in

Commerce's analysis, Commerce may adjust a company's allocation

method to more reasonably reflect costs.  I & D Mem. Cmt. 1 at 10;

Def.'s Br. at 19; See also 19 U.S.C.§ 1677b(b)(1)-(b)(2)(c).

    PRCBC adds that it would be distortive to use different

costs for the COP, CV and DIFMER contexts; PRCBC's Resp. Br.

at 15-17. See also I & D Mem. Cmt. 1 at 10 n.3; NTN Bearing Corp.

of America v. United States, 368 F.3d 1369, 1374 (Fed. Cir.

2004).

    To the contrary, as Thai Plastic Bags I explained:

> In its determination, Commerce decided to revise
> TPBG's cost allocations (regarding direct labor,
> variable overhead and fixed overhead costs) to
> eliminate a "distortion" based on factors not
> attributable to physical characteristics.  74
> Fed.Reg. 39, 931 . . . . Commerce reallocated
> TPBG's costs for the sales-below-cost test, the
> constructed-value calculations and the difference-
> in-merchandise adjustment. Id. The governments'
> [sic] legal determination to apply its adjustment
> for all three purposes was reasonable because the
> calculation of costs "reasonably reflect[ed]" the
> associated costs of production and sales. See 19
> U.S.C. § 1677b (f)(1)(A). As the SAA explains,

> Commerce must use a methodology that reasonably captures all of the costs incurred in manufacturing and selling the product at issue. SAA at 835. Further, "if Commerce determines that costs, including financing costs, have been shifted away from the production of the subject merchandise, or the foreign like product, it will adjust costs appropriately, to ensure they are not artificially reduced". *Id. See NTN Bearing Corp. of America v. U.S.*, 368 F.3d 1369, 1374 (Fed.Cir., 2004)("Commerce noted that it 'does not rely on a respondent's reported costs solely for the calculation of COP and CV,' Final Results, 63 Fed.Reg. at 2574, and concluded that it would be distortive to adjust those costs only for those calculations, but not for others in which they were used. *Id.* ('[I]f we determine a component of a respondent's COP and CV is distortive for one aspect of our analysis, it is reasonable to make the same determination with respect to those other aspects of our margin calculations where we relied on the identical cost data.'). We concur with Commerce's analysis and hold that it did not err in interpreting these provisions to permit it to employ affiliated supplier cost data to calculate cost deviations to limit the definition of similar merchandise, the difmer adjustment, and inventory carrying costs.").

Thai Plastic Bags I, 34 CIT __, 752 F. Supp. 2d at 1328 n.28.

TPBI also asserts that Commerce's determination was arbitrary because Commerce failed to cite a benchmark and did not address all of the factors that might influence cost differences between similar products. TPBI's Br. at 18-20. In addition, TPBI contends that Commerce's regulations did not require that cost differences unrelated to physical characteristics must be reallocated or that the DIFMER standard be applied. Id. at 27-28.

However, Commerce correctly notes that it may, but is not

under an obligation to cite benchmarks or address all potential cost factors, and Plaintiff did not provide the record evidence necessary to do so. Def.'s Br. at 20-21; See 19 C.F.R. § 351.407(c).[11] Commerce differentiates TPBI's cited authority from the present matter, stating that Commerce is not required to conduct a factor by factor analysis in this case, as there is only one product at issue. Def.'s Br. at 22-24.  Commerce also relies on its past decisions in support of its practice. I & D Mem. Cmt. 1 at 11-12.[12]

Despite TPBI's argument that each of the cited cases is distinguishable, Commerce analyzed TPBI's costs in line with the agency practice of considering whether costs are allocated according to physical characteristics of the product as a primary factor. Def.'s Br. at 17.  Recognizing that the DIFMER adjustment

---

[11] Commerce notes that in Certain Preserved Mushrooms from India, 63 Fed. Reg. 72, 246 (Dep't Commerce Dec. 31, 1998) (notice of final determination of sales at less than fair value), Commerce rejected the reported methodology because it may consider other factors in analyzing the costs of production, but that it is not obligated to do so. Def.'s Br. at 22-23.

[12] Commerce states that the common thread in the three cited cases is Commerce's consistent actions in reallocating costs to address distortions on the record. See Stainless Steel Bar from the United Kingdom, 72 Fed. Reg. 43,598 (Dep't Commerce Aug. 6, 2007) (final results of antidumping duty administrative review); Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Japan, 64 Fed. Reg. 24,329 (Dep't Commerce May 6, 1999) (notice of final determination of sales at less than fair value); Small Diameter Circular Seamless Carbon and Alloy Steel, Standard, Line and Pressure Pipe from Brazil, 60 Fed. Reg. 31,960 (Dep't Commerce June 19, 1995) (notice of final determination of sales at less than fair value).

is a price adjustment, Commerce still found that using physical characteristics was necessary for its analysis as the physical differences influence the price of products. I & D Mem. Cmt. 1 at 10 n.2; Def.'s Br. at 19-20. See also 19 C.F.R. 351.411(a)-(b). Commerce notes that its regulations do not prohibit Commerce from adjusting reported costs to ensure that there would not be a DIFMER adjustment for conversion cost differences. I & D Mem. Cmt. 1 at 13; PRCBC's Resp. Br. at 14.

Commerce also counters TPBI's argument that Commerce's costs reallocation was inappropriate because there was no evidence of under-reporting. See TPBI's Br. at 22. Commerce notes that it is not required to wait for under-reporting before determining that those costs did not reasonably reflect actual costs. Def.'s Br. at 24. Commerce found a distortion in that the reported conversion costs were understated for some models and overstated for others; resulting in the need to adjust the costs. I & D Mem. Cmt. 1 at 13; Def.'s Br. at 25.

Thus, Commerce's cost analysis in this fifth administrative review is consistent with Commerce's determination in the fourth review, in which Commerce reasonably adjusted reported costs to reasonably reflect actual costs. Thai Plastic Bags I, 34 CIT at ___, 752 F. Supp. 2d at 1328 n.28; Def.'s Br. at 26.

### C.   Alternate Cost Methodology

In responding to Commerce's request for cost data, TPBI submitted two alternate sets of costs for its margin calculation, both of which Commerce rejected, finding that they distorted TPBI's actual conversion costs. TPBI Pl.'s Br. at 15-16; Def.'s Br. at 29. While Commerce may consider alternative methods, Commerce should only choose such a method if it minimizes distortions. Def.'s Br. at 29-30; See also U.S. Steel Group v. United States, 24 CIT 757 (2000); 19 C.F.R. § 351.407(c).

TPBI argues that Commerce should have used one of TPBI's two proposed cost allocation methodologies, as they were both reasonable alternatives. TPBI's Br. at 15-16.  TPBI also claims – without proof – that by using weight-averaging for all of its labor and fixed and variable overhead costs, Commerce added more distortions, not fewer. TPBI's Br. at 31.

TPBI further argues that Commerce should have accorded it a chance to correct any deficiency in its cost allocations and that Commerce should not have applied "facts otherwise available." TPBI's Br. at 32-33. See also 19 U.S.C. § 1677m(d)-(e)[13]; 19 U.S.C.

---

[13] (e) Use of certain information
In reaching a determination under section 1671b, 1671d, 1673b, 1673d, 1675, or 1675b of this title the administering authority and the Commission shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the
(continued...)

§ 1677e(a).   TPBI also asserts that its cost information can be used without undue difficulty because Commerce's analysis is flawed and TPBI's information is more reasonable. TPBI's Br. at 32.

Commerce's conclusion, however — "that it was more important to use a cost allocation methodology that diminished the possibility of extreme undervaluation or overvaluation, even if that meant that a DIFMER adjustment could not be made[,]" Def.'s Br. at 31; I & D Mem. Cmt. 1 at 12 – was not unreasonable. Commerce correctly states that after finding TPBI's methodologies to be distortive, Commerce was under no obligation to utilize them. Def.'s Br. at 29; I & D Mem. Cmt. 1 at 13 - 14.   In addition, Commerce reasonably found that there was an undue difficulty as

---

[13](...continued)
Commission, if—

(1) the information is submitted by the deadline established for its submission,

(2) the information can be verified,

(3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,

(4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and

(5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).

well as a distortion in Plaintiff's cost allocations. I & D Mem. at 14.

Moreover, despite TPBI's contention that it was not notified, TPBI's Br. at 33, Commerce did notify Plaintiff when it rejected its method in the fourth review and issued supplemental questionnaires. Def.'s Br. at 6-7, 32; Id. Ex. E at SID-2.

Based on the record here, Commerce reasonably found Plaintiff's methodologies to be distortive.  Commerce's determination on this issue is therefore affirmed.

II.      TPBI Issue 2: Zeroing

Where imported goods are being sold in the United States at less than fair value and to the detriment of domestic industry, the statute directs Commerce to impose an antidumping duty on those imported goods "equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673.[14]

Here Commerce applied its "zeroing" methodology in arriving at Plaintiff's weighted-average dumping margins.[15]  In the

---

[14] "Dumping margin" is defined as "the amount by which the normal value exceeds the export price or constructed export price." 19 U.S.C. § 1677(35)(A).  Weighted average dumping margin is defined as "the percentage determined by dividing the aggregate dumping margins determined for a specific exporter or producer by the aggregate export prices and constructed export prices of such exporter or producer." 19 U.S.C. § 1677(35)(B).

[15] Zeroing refers to the method used by Commerce to aggregate positive margins (margins for sales of merchandise sold
(continued...)

administrative review, TPBI argued that zeroing in this context was

incorrect, because the World Trade Organization ("WTO") has ruled

against this practice. TPBI Case Br. at 59.

Before the court, TPBI contends, based on current law,

that "Commerce failed to explain why its inconsistent statutory

interpretation [i.e., differing in administrative reviews from

the interpretation applied in investigations] with regard to

zeroing is reasonable., TPBI Pl.'s Br. at 36, and that the court

should remand because Commerce must either explain its

inconsistent interpretation of 19 U.S.C. § 1677(35) or adopt a

consistent interpretation for both investigations and reviews.

TPBI Pl.'s Br. 36-37.

Commerce argues that denying offsets and applying zeroing

serves the policy rationale of combating masked dumping. I & D Mem.

Cmt. 4 at 22.  In addition, Commerce contends that Plaintiff has

failed to exhaust its administrative remedies because Plaintiff did

---

[15](...continued)
at dumped prices)and give a value of zero for negative margins
(margins for sales of merchandise sold at non-dumped prices).
Dongbu Steel Co. v. United States, 635 F.3d 1363, 1366 (Fed. Cir.
2010).

When calculating weighted average dumping margins,
Commerce may employ either of two methodologies: zeroing or
offsetting. Timken Co. v. United States, 354 F.3d 1334, 1341-45
(Fed. Cir. 2004) (holding that 19 U.S.C. § 1677(35) is ambiguous
and that zeroing is a reasonable interpretation); U.S. Steel
Corp. v. United States, 621 F.3d 1351, 1360-63 (Fed. Cir. 2010)
(holding that 19 U.S.C. § 1677(35) is ambiguous and that
offsetting is also a reasonable interpretation).

not rely in its briefing on Commerce's differing interpretations of 19 U.S.C. § 1677(35) in the context of administrative reviews as opposed to investigations, or regarding average to transaction and average to average comparison methods, respectively. Def.'s Br. at 34.

Despite arguing that Plaintiff has not exhausted its administrative remedies here, that the Federal Circuit has already rejected TPBI's argument regarding WTO related activities, and that exhausting remedies would not have been futile, in the alternative, Commerce requests a remand. Def.'s Br. at 34, 37.[16]  The court will grant this request.[17]  Here, the briefing in the administrative review occurred before the parties had sufficient time to consider the Federal Circuit's decision in Dongbu.  Commerce will now have the opportunity to fully explain its reasoning regarding the

---

[16] See Grobest & I-Mei Indus. (Vietnam) Co., Ltd. v. United States, 36 CIT ___, 815 F. Supp. 2d 1342, 1348-50. (2012).

[17] Two recent decisions from the Court of Appeals for the Federal Circuit guide this court's decision of this issue: Dongbu Steel Co. v. United States, 635 F.3d 1363 (Fed. Cir. 2011) and JTEKT Corp. v. United States, 642 F.3d 1378 (Fed. Cir. 2011), which addressed Commerce's inconsistent interpretations of 19 U.S.C. § 1677(35).  Dongbu held that "[i]n the absence of sufficient reasons for interpreting the same statutory provision inconsistently, Commerce's action is arbitrary." 635 F.3d at 1372-73.
     Subsequently, JTEKT concluded that "[w]hile Commerce did point to differences between investigations and administrative reviews, it failed to address the relevant question — why is it a reasonable interpretation of the statute to zero in administrative reviews, but not in investigations?" 642 F.3d at 1384.

zeroing issue.[18] See also Union Steel v. United States, 35 CIT __,
804 F. Supp. 2d 1356, 1367-68 (2011) ("The court concludes, upon
reconsidering its decision in Union II, that it is appropriate to
set aside its affirmance of the use of zeroing and to direct
Commerce to provide the explanation contemplated by the Court of
Appeals in Dongbu and JTEKT Corp.").

III.      PRCBC Issue 3: Transactions-Disregarded Rule

        During the POR, TPBI purchased three types of resin[19] from
suppliers (both affiliated and unaffiliated). TPBI's Supp. Section
D Resp., A-549-821, ARP 08-09 (Mar. 22, 2010), Admin. R. Con. Doc.
14 [Pub. Doc. 55] at Ex. S1D-3 ("Supp. Resp. 1").   In its
Preliminary Results, Commerce determined that TPBI purchased resin
from an affiliated supplier.  Prelim. Results, 75 Fed. Reg.
at 53,955; Def.'s Br. at 42.  Commerce then applied the major input
rule[20] and adjusted the COM to reflect the market value of the

---

[18] As the decision in Dongbu was not available prior to the
Final Results in this administrative review, the court does not
credit Commerce's exhaustion argument. See JTEKT, 642 F.3d
at 1384 ("[Appellant] did not have the benefit of the Dongbu
opinion before filing its briefs and thus could not have argued
that the case requires us to vacate, but it nonetheless preserved
the issue on appeal by arguing that Commerce's continuing
practice of zeroing in administrative reviews, but not in
investigations, is unreasonable.").

[19] [[                                              ]]

[20] The AD Statute defines the major input rule as follows:

    If, in the case of a transaction between affiliated
    persons involving the production by one of such persons
                                              (continued...)

resin. _Id._   Commerce then compared only the transfer prices and purchases of LLD resin from the affiliated Supplier. _See_ _I & D Mem._ Cmt. 2 at 18-19; Def.'s Br. at 42.

More specifically, in adjusting the COM, Commerce compared the transfer price of LLD resin with the arm's-length transaction price of LLD resin. _See_ _Prelim. Cost Mem._ at 4. Commerce thus compared purchases separately for a specific resin type. _Id._; Br. of PRCBC in Support of Mot. for J. on Agency R. at 11-12, ECF No. 49 ("PRCBC's Br.").

However, in the _Final Results_, Commerce changed its methodology and used the transactions-disregarded rule,[21] comparing

---

[20](...continued)
of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph (2).

19 U.S.C. § 1677b(f)(3).

[21] A transaction directly or indirectly between affiliated persons may be disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration. If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction
(continued...)

average transfer and market prices across all types of resin; even though the parties did not argue for revising the level of specificity at which to apply the transactions disregarded rule. PRCBC's Br. at 11-12; I & D Mem. at 19.[22]

TPBI, as a respondent, argued that Commerce should not have applied the major input rule because the affiliated supplier was not a resin manufacturer. See TPBI's Case Br. at 50-51, 59.

PRCBC argues that the court should remand this issue, stating that Commerce changed its analysis for the Final Results without providing an avenue for comments by the interested parties or a chance for Commerce to consider those comments. PRCBC's Br. at 11-15.  Commerce now agrees. Def.'s Br. at 41.

As an agency may request a remand to reconsider its position, SKF USA, Inc. v. United States, 254 F.3d 1022, 1028 (Fed. Cir. 2001), the court will remand this issue so that Commerce can

_____

(...continued)
    had occurred between persons who are not affiliated.

19 U.S.C. § 1677b(f)(2).

    [22] For the Final Results, Commerce revised its preliminary results and changed the analysis for TPBI's affiliated resin input purchases to "include all purchases of resin that TPBI made during the POR." Final Cost Mem., A-549-821, ARP 08-09 (Mar. 1, 2011), Admin. R Con. Doc. 47 [Pub. Doc. 137] at 1-2, Pub. Doc. 47 (March 1, 2011).  PRCBC notes that because Commerce ultimately decided to apply only the transactions disregarded rule, which does not depend upon whether a raw material is a "major output," that TPBI's argument regarding whether resin was a major input is moot. PRCBC's Br. at 12 n.5; see also I & D Mem. at 18-19.

give the parties the proper opportunity to comment.[23]

IV.          PRCBC Issue 4 : Inventory-Valuation Losses

Under the statute, the calculation of COP includes an

amount for general and administrative ("G&A") expenses.[24]

Commerce's practice is to include inventory valuation losses in

G&A expenses except for those losses relating to finished good's

inventories. Def.'s Br. at 38; Stainless Steel Wire Rod from the

Republic of Korea, 69 Fed. Reg. 19,153, 19,161 (Dep't Commerce

Apr. 12, 2004) (final results of antidumping duty administrative

review) and accompanying Issues and Decision Memorandum, A-580-

829, ARP 01-02 (Apr. 5, 2004) Cmt. 7; PRCBC's Br. at 15.

Here, Commerce did not include inventory-valuation losses

in TPBI's G&A expenses. See Pet'rs' Case Br., A-549-821, ARP 08-09

[23] The court notes that Commerce must require a cost
adjustment for materials purchased from an affiliated supplier at
below market price, see 19 U.S.C. § 1677b(f)(2), but this
regulation is silent on what price data Commerce should use in
applying the transactions-disregarded rule.
    While no regulation directly addresses this issue,
Commerce's adjustment in the Final Results appears contrary to
its past practice.  In Certain Pasta from Italy, Commerce limited
its cost adjustment analysis to a comparison of the weighted-
average transfer price for semolina from affiliated suppliers to
the arms-length price for this input. 69 Fed. Reg. 6,255, 6,257
(Dep't Commerce Feb. 10, 2004) (notice of final results of the
sixth administrative review of the antidumping order) and
accompanying Issues and Decision Memorandum, A-475-818, ARP 01-02
(Feb. 3, 2004) Cmt. 32.  In applying the transactions-disregarded
rule, Commerce did not include all purchases from the affiliated
supplier but only took into account the input at issue. Id.

[24] G&A expenses are expenses incurred in running a business,
as distinguished from expenses incurred in manufacturing or
selling. Black's Law Dictionary 618 (8th ed. 2004).

(Dec. 10, 2010), Admin. R. Con. Doc. 41 [Pub. Doc. 126] at 4.
PRCBC contends that Commerce's finding that TPBI's inventory
valuation losses were attributable to finished goods inventory, and
thus excluded from G&A expenses, was unreasonable. PRCBC's Br. at
16.  PRCBC argues that instead these losses should have been part
of the cost of production. PRCBC's Br. at 18.

However, because Commerce may exercise its authority to
draw reasonable inferences from the record, Daewoo Elecs. Co. v.
Int'l Union of Electronic Elec., Technical, Salaried and Mach.
Workers, AFL-CIO, 6 F.3d 1511, 1520 (Fed. Cir. 1993); Grobest, 36
CIT at __, 815 F. Supp. 2d at 1356 (2012), Commerce's determination
that Plaintiff's inventory-valuation losses should be excluded from
the cost calculations was supported by the record.

In its determination, Commerce concluded that TPBI's 2009
inventory losses should be excluded because the evidence suggested
that these reported losses were related to finished goods. Def.'s
Br. at 38; I & D Mem. Cmt. 6 at 26.  PRCBC claims that Commerce
relied upon evidence that cannot support its determination. PRCBC's
Br. at 16-17.[25]  Specifically, PRCBC argues that, as no amount for
inventory valuation losses was explicitly listed in the statement
of administrative expenses, Commerce's determination was not

---

[25] TPBI had changed its inventory losses accounting between
2008-2009 and submitted comparative 2009 schedules showing that
the 2008 inventory valuation losses related to finished goods.
Def.'s Br. at 38-39.

reasonable. PRCBC's Br. at 18-19.

However, in the Final Results, Commerce reasonably articulated its basis for excluding TPBI's inventory-valuation losses from the G&A expenses. See I & D Mem. Cmt. 6 at 26. Commerce explained that TPBI provided documentary support to show that its 2008 inventory-losses related to finished goods.[26] Id. TPBI also reconciled the 2009 data with the 2008 data. See Submission of 2009 Financial Statements, A-549-821, ARP 08-09 (July 7, 2010) Admin. R. Con. Doc. 25 [Pub. Doc. 84], Ex. Supp-1 at 17, 25. Thus, while PRCBC is correct that there was no express listing for finished goods in the 2009 data, this does not topple the totality of Commerce's reasoning, including the record evidence that the 2008 inventory valuation losses were related to finished goods.

Commerce cites to record evidence to bolster its claim that TPBI's reported inventory valuation losses were related to finished goods. In particular, in its responses to Commerce, TPBI stated that during the POR it had raw materials, work-in-progress and finished goods in inventory and that raw materials and work-in-progress were valued at actual cost, whereas finished goods were valued at actual cost or net realizable value at year's end, depending on which was lower. Def.'s Br. Ex. B at D-11; Def.'s

---

[26] In its response to Supplemental D Questionnaire, TPBI stated that there were write-downs for finished goods but not raw materials or WIPs. See Supp. Resp. 1 at 10.

Ex. F at S4D-2 to S4D-3; Def.'s Br. at 39-40.

TPBI provided documentation showing that an inventory valuation loss from 2008[27] was attributable to finished goods. Supp. Resp. 1 at Ex. S1D-10; PRCBC's Br. at 16.  This same loss appears in the comparative schedule in the 2009 financial statements. TPBI's Supp. Section D Resp., A-549-821, ARP 08-09 (July 26, 2010), Admin. R. Con. Doc. 27 [Pub. Doc. 90] Ex. S4D2-1, at 17 ("Supp. Resp. 2"); PRCBC's Br. at 16.  PRCBC argues that this is not evidence that TPBI's 2009 inventory valuation losses[28] are also related to finished goods, as they may also be attributable to raw materials and works-in-progress. PRCBC's Br. at 16-17; Supp. Resp. 2 Ex. S4D2-1 at 11 n.3.

PRCBC also states that even though the 2008 to 2009 change in inventory valuation losses was identified,[29] and that this same amount appears in the cost reconciliation,[30] that this does not provide enough information to conclude whether the loss is attributable to finished goods, WIP or RM. PRCBC's Br. at 17; Supp. Resp. 2 Ex. S4D2-1 at 17; TPBI's Supp. Section D Resp., A-549-821, ARP 08-09 (Aug. 18, 2010), Admin. R. Con. Doc. 32 [Pub. Doc. 99]

---

[27] [[                ]] baht.

[28] [[                ]] baht.

[29] [[          ]] baht.

[30] Under the item [[
                ]].

Ex. S5D1 worksheet D at 2.   PRCBC claims that it is Commerce's obligation to deny the adjustment instead of assuming that the 2009 losses should be excluded from normal value. PRCBC's Br. at 18; 19 C.F.R. § 351.401(b)(1).[31]

Commerce counters that in analyzing the inventory valuation loss for 2009, it looked to the statement of administrative expenses, which showed TPBI's report of a loss from a cost higher than net realizable value for finished goods as a 2008 administrative expense, but that no amount for 2009 was reported. Def.'s Br. at 40; Def's Br. Ex. F; I & D Mem. at 26.

In addition, in responding to a questionnaire on the issue, TPBI explained that there was a "roll-up into COGS (costs of goods sold) of all the relevant cost elements[.]" Def.'s Br. Ex. F at S4D-5.[32]  TPBI also later submitted a cost reconciliation. Def.'s Br. Ex. G at S5D-1.

As Commerce may make reasonable inferences based on the record, "[t]he specific determination [the court] make[s] is 'whether the evidence and reasonable inferences from the record

---

[31] PRCBC notes that TPBI did not address and Commerce ignored the fact that the line item entitled [[                         ]] shows a [[       ]] value for 2009. Supp. Resp. 2 at Ex. S4D2-1 (CR 17); PRCBC's Br. at 18. The court notes that this line is [[                         ]].

[32] While the 2008 chart reported no amount for "loss from cost higher than net realizable value," Def.'s Br. Ex. F, the 2009 chart reported an amount under the same heading. Def.'s Br. Ex. G. at SD5-6; Def.'s Br. at 41.

support the [Commerce's] finding.'. The question is whether the

record adequately supports the decision of the [Department], not

whether some other inference could reasonably have been drawn."

Daewoo Elecs., 6 F.3d at 1520 (citation omitted) (quoting

Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933

(Fed. Cir. 1984)).

Even if PRCBC posits evidence that may detract from

Commerce's determination, PRCBC's Br. at 18, just because there

are alternative inferences that could be drawn does not mean that

Commerce was unreasonable. Goldlink Indus. Co. v. United States,

30 CIT 616, 619, 431 F. Supp. 2d 1323, 1327 (2006) ("The Court's

role in the case at bar is not to evaluate whether the

information Commerce used was the best available, but rather

whether a reasonable mind could conclude that Commerce chose the

best available information.")

Based on the foregoing record evidence, including

TPBI's past treatment of such losses and its responses to

Commerce, it is reasonable for Commerce, to infer that the 2009

inventory-valuation losses related to finished goods. Commerce's

decision to exclude inventory-valuation losses is therefore

supported by substantial evidence and will be affirmed.

## CONCLUSION

For the reasons discussed above, the court grants Plaintiffs' motions regarding issues two and three.  The <u>Final Results</u> are otherwise affirmed in all respects.

Commerce shall have until August 17, 2012 to complete and file its remand redetermination.  Both Plaintiffs shall have until August 31, 2012 to file comments.  Defendant shall have until September 14, 2012 to file any reply.  Plaintiffs, also by September 14, 2012, may each reply to the other's comments.

It is **SO ORDERED**.

<u>    /s/ Donald C. Pogue    </u>
Donald C. Pogue, Chief Judge

Dated: June 18, 2012
       New York, N.Y.