Slip Op. 13 - 21

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THAI PLASTIC BAGS INDUSTRIES CO., LTD., <br><br>             Plaintiff, <br><br>             v. <br><br> UNITED STATES, <br><br>             Defendant, <br><br>             and <br><br> POLYETHYLENE RETAIL CARRIER BAG COMMITTEE, HILEX POLY CO., LLC, and SUPERBAG CORPORATION, <br><br>             Defendant-Intervenors. | Before: Donald C. Pogue, <br>          Chief Judge <br><br> Consol. Court No. 11-00086 |

OPINION

[agency's determination on remand affirmed]

Dated: February 11, 2013

Irene H. Chen, Chen Law Group LLC, of Rockville, MD, and Mark B. Lehnardt, Lehnardt & Lehnardt, LLC, of Liberty, MO, for Thai Plastic Bags Industries, Co., Ltd.

Joseph W. Dorn, Stephen A. Jones, and Daniel L. Schneiderman, King & Spalding LLP, of Washington, DC, for Polyethylene Retail Carrier Bag Committee, Hilex Poly Co., LLC, and Superbag Corporation.

Vincent D. Phillips and Ryan M. Majerus, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. Also on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Scott D. McBride, Senior Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

**Pogue, Chief Judge:**  Before the court is a
determination by the United States Department of Commerce
("Commerce") in response to a previously ordered remand.[1]  In
prior proceedings, the court granted Commerce's request for a
voluntary remand on two grounds: 1) to allow Commerce to provide
additional explanation for its decision to assign a dumping
margin of zero to all U.S. sales where export price was greater
than normal value (referred to as "zeroing") when calculating
respondents' weighted-average dumping margins during the
antidumping duty review at issue; and 2) to allow Commerce to
consider the parties' comments and to review Commerce's
application of the "transactions disregarded" cost adjustment
when constructing a normal value in this review. Thai Plastic
Bags I, __ CIT at __, 853 F. Supp. 2d at 1277-79.

For the reasons below, Commerce's Remand Results will
be affirmed.

### STANDARD OF REVIEW

This court will uphold Commerce's antidumping
determinations if they are in accordance with law and supported

---

[1] See Results of Redetermination Pursuant to Court Remand,
ECF No. 92 ("Remand Results"); Thai Plastic Bags Indus. Co. v.
United States, __ CIT __, 853 F. Supp. 2d 1267 (2012) ("Thai
Plastic Bags I") (remanding Polyethylene Retail Carrier Bags
from Thailand, 76 Fed. Reg. 12,700 (Dep't Commerce Mar. 8, 2011)
(final results of antidumping duty administrative review) and
accompanying Issues & Decision Mem., A-549-821, ARP 08-09
(Mar. 1, 2011) ("I & D Mem.")).

by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). Where

the antidumping statute does not directly specify a method for

its application, the court will defer to Commerce's statutory

construction if it is reasonable. Timken Co. v. United States,

354 F.3d 1334, 1342 (Fed. Cir. 2004) (relying on Chevron,

U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837,

842-43 (1984)).

### DISCUSSION

I.   Zeroing

When comparing respondents' export prices to the

merchandise's normal value in this review, Commerce treated

sales made at or above normal value as not dumped; Commerce

therefore did not aggregate the (negative) normal-to-export

price differences of such sales with the (positive) normal-to-

export price differences of the dumped sales made at prices

below normal value. I & D Mem. cmt. 4 at 21.[2]  Plaintiff Thai

---

[2] To determine whether merchandise is being "dumped,"
19 U.S.C. § 1677(34) (defining "dumped" and "dumping" as "the
sale or likely sale of goods at less than fair value"), Commerce
must make "a fair comparison" between the export price (which is
sometimes constructed, see id. at § 1677a(b)) and the
merchandise's "normal value." Id. at § 1677b(a) (providing
instructions for calculating "normal value" that seek to
"achieve a fair comparison with the export price or constructed
export price"). The amount by which the normal value exceeds
the export price is known as the "dumping margin."
Id. at § 1677(35)(A). Commerce generally aggregates the various
dumping margins determined for a given exporter or producer and
divides this aggregate by the aggregate export prices of such
(footnote continued)

Plastic Bags Industries Company, Limited ("TPBI"), a respondent

in this review, argued that Commerce acted contrary to law as

articulated in the jurisprudence of the World Trade Organization

("WTO"). See id. at 20-21.  Commerce rejected TPBI's WTO-based

challenge on the ground that WTO jurisprudence *per se* is not a

source of legal authority in the United States unless and until

specifically implemented pursuant to the procedures established

by the Uruguay Round Agreements Act. Id. at 22 (citing NSK Ltd.

v. United States, 510 F.3d 1375, [1380] (Fed. Cir. 2007); Corus

Staal BV v. United States, 502 F.3d 1370, 1375 (Fed. Cir. 2007);

Corus Staal BV v. Dep't of Commerce, 395 F.3d 1343, 1347-49

(Fed. Cir. 2005)).[3]

---

exporter or producer to arrive at the weighted average dumping
margin that will form the basis for antidumping duty assessment.
See id. at §§ 1677(35)(B), 1673d(c)(1)(B)(i); see also
id. at §§ 1673, 1673e(a)(1), 1673e(c)(3) (providing that
antidumping duties are assessed in an amount equal to the amount
by which the normal value exceeds the export price for the
merchandise).

[3] See, e.g., Corus Staal, 395 F.3d at 1348 ("WTO decisions
are not binding on the United States, much less this court.")
(internal quotation marks and citation omitted); id. at 1349
("[Congress] has authorized the United States Trade
Representative, an arm of the Executive Branch, in consultation
with various congressional and executive bodies and agencies, to
determine whether or not to implement WTO reports and
determinations and, if so implemented, the extent of
implementation.") (citing 19 U.S.C. §§ 3533(f)-(g), 3538);
id. ("[The court will not] overturn Commerce's zeroing practice
based on any ruling by the WTO or other international body
unless and until such ruling has been adopted pursuant to the
specified statutory scheme.").

In this action, TPBI argued for remand because
Commerce's refusal to aggregate *all* of the normal-to-export
price differences of TPBI's U.S. sales, regardless of whether
normal value exceeded the individual export prices, was
inconsistent with Commerce's approach to aggregating price
differences when calculating weighted-average dumping margins in
initial dumping investigations. Thai Plastic Bags I, __ CIT
at __, 853 F. Supp. 2d at 1277.  Commerce requested a voluntary
remand to explain its reasoning. Id.  Noting two recent Court of
Appeals decisions requiring further explanation for Commerce's
apparently inconsistent application of the antidumping law in
initial dumping investigations and subsequent administrative
reviews, the court granted Commerce's request for a voluntary
remand of this issue. Id. at n.17 (citing Dongbu Steel Co. v.
United States, 635 F.3d 1363, 1372-73 (Fed. Cir. 2011); JTEKT
Corp. v. United States, 642 F.3d 1378, 1384 (Fed. Cir. 2011)).

In its Remand Results, Commerce has provided
additional explanation for its determination not to aggregate
the negative price margins of TPBI's non-dumped sales with the
dumping margins of TPBI's dumped sales, notwithstanding the
agency's approach to calculating weighted-average dumping
margins in initial investigations. Remand Results at 2-13.  TPBI
continues to object to this determination. [TPBI]'s Comments on
the Results of Redetermination Pursuant to Ct. Remand,

ECF No. 98 ("TPBI's Br.") at 1-10.  As explained below, however,
Commerce has provided an explanation that comports with a
reasonable reading of its statutory authority.  Accordingly, the
Remand Results will be affirmed on this issue.

### A. Background

Respondents in antidumping proceedings have long
sought — and, until recently, Commerce has long declined — to
offset the dumping margins of sales at less than fair value
("LTFV") with the negative normal-to-export price margins of
non-dumped sales. See, e.g., Serampore Indus. Pvt. Ltd. v. U.S.
Dep't of Commerce, 11 CIT 866, 873-74, 675 F. Supp. 1354, 1360-
61 (1987) (addressing this claim and holding that "[a] plain
reading of the [antidumping] statute discloses no provision for
Commerce to offset sales made at LTFV with sales made at fair
value" and that Commerce's interpretation of the statute "to
prevent a foreign producer from masking its dumping with more
profitable sales" was reasonable).  Rather than offset the
dumping margins of sales made at LTFV with the negative normal-
to-export price margins of non-dumped sales, Commerce
historically has interpreted "dumping" to mean that any sale not
made at LTFV was not "dumped" and therefore had a "dumping
margin" of zero. See id.; 19 U.S.C. §§ 1677(34) (defining
"dumped" and "dumping" to "refer to the sale or likely sale of
goods at less than fair value"), 1677(35)(A) (defining "dumping

margin" as "the amount by which the normal value exceeds the

export price or constructed export price of the subject

merchandise"). Commerce's policy of not permitting the dumping

margins of dumped sales to be offset or negated by the negative

normal-to-export price differences of non-dumped sales has

accordingly come to be known, perhaps misleadingly, as zeroing.[4]

Responding to certain recommendations made by the

WTO's Dispute Settlement Body,[5] however, Commerce determined

---

[4] This label may be misleading because it suggests that non-dumped sales are entirely zeroed out and have no effect upon ultimate antidumping duty assessment rates. But "the weighted-average margin will reflect any non-dumped merchandise examined during the [period of review] [because] the value of such sales is included in the denominator of the weighted-average dumping margin while no dumping amount for non-dumped merchandise is included in the numerator[,] [such that] a greater amount of non-dumped merchandise results in a lower weighted-average margin." I & D Mem. cmt. 4 at 21.

[5] Seventeen disputes concerning the practice of zeroing – fifteen of them filed against the United States – have been adjudicated to date in the WTO. World Trade Organization, Index of Disputes by Issue, http://www.wto.org/english/tratop_e/dispu_e/dispu_subjects_index_e.htm#selected_subject (last visited Feb. 7, 2013) (listing seventeen disputes under the topic "zeroing").
        The heart of the dispute is definitional. The U.S. Trade Representative argued in the WTO, as Commerce does in its Remand Results here, that when dumping analysis is performed on a transaction-specific basis, any normal-to-export price comparison that yields a negative result indicates that the transaction in question was not a dumped sale; to treat the amount by which the export price of such a transaction exceeded normal value as a negative dumping margin, and to permit this negative dumping margin to offset the dumping margins of dumped transactions, is contrary to the definition of dumping as selling at prices below normal value. See, e.g., Appellate Body

(footnote continued)

Report, United States - Laws, Regulations and Methodology for
Calculating Dumping Margins ("Zeroing"), ¶¶ 32-33, 35, 46-47,
WT/DS294/AB/R (Apr. 18, 2006); Remand Results at 12.

For the WTO's Dispute Settlement Body, on the other
hand, dumping analysis by definition cannot be performed on a
transaction-specific basis, and necessarily examines an
exporter's pricing behavior over a certain period of time; by
this definition of dumping as selling at *aggregate* prices below
normal value, negative normal-to-export price comparisons are
not negative dumping margins but relevant pricing behavior for
determining overall dumping margins. See, e.g., Appellate Body
Report, United States - Final Anti-Dumping Measures on Stainless
Steel From Mexico, ¶ 113, WT/DS344/AB/R (Apr. 30, 2008) ("United
States - Stainless Steel from Mexico") ("In our view, it is not
correct to say that . . . an 'offset' is provided for the so-
called 'non-dumped' transactions. A margin of dumping is
properly calculated under the Anti-Dumping Agreement only if all
transactions are taken into account, including those where the
export prices exceed the normal value.").

Although "[i]t is well settled that Appellate Body
reports are not binding, except with respect to resolving the
particular dispute between the parties," United States -
Stainless Steel from Mexico at ¶ 158 (citation and footnote
omitted), the Appellate Body has expressed "deep concern"
regarding any departure from "well-established [WTO]
jurisprudence," id. at ¶ 162, which has reached "a definitive
outcome" with respect to the definition of dumping and the
practice of zeroing as such. Appellate Body Report, United
States - Continued Existence and Application of Zeroing
Methodology, ¶ 312, WT/DS350/AB/R (Feb. 4, 2009) (concurring
opinion); see also United States - Stainless Steel from Mexico
at ¶ 112 ("[W]hatever methodology is followed for assessment and
collection of anti-dumping duties, . . . the total amount of
dumping found in all the sales made by the exporter concerned
[must be] calculated according to the margin of dumping
established for that exporter without zeroing. . . . [T]he terms
'dumping' and 'margin of dumping' cannot be interpreted as
applying at an individual transaction level, as the United
States suggests.") (citations omitted). Compare with Timken,
354 F.3d at 1342 ("Commerce calculates dumping duties on an
entry-by-entry basis. Its practice of zeroing negative dumping
margins . . . neutralizes dumped sales and has no effect on
fair-value sales.") (citing 19 U.S.C. § 1675(a)(2)); Dongbu,
635 F.3d at 1365 ("This court has opined that the statutory text
. . . is sufficiently ambiguous to defer to Commerce's decision
                                        (footnote continued)

that, in certain contexts, it will begin to aggregate all
normal-to-export price comparisons, including the results of
price comparisons for sales made at prices above normal value.[6]
Due to its expressly limited applicability, one effect of this
modification was that Commerce was now aggregating negative
normal-to-export price comparisons in some contexts but not
others. See Dongbu, 635 F.3d at 1365.  In Dongbu and JTEKT, the
Court of Appeals held that the reasonableness of interpreting
the antidumping statute to allow for such distinctions required
more explanation than Commerce had then provided. Dongbu,
635 F.3d at 1373; JTEKT, 642 F.3d at 1384-85.

     *B. Analysis*

     In a number of decisions post-dating Dongbu and JTEKT,
this Court has affirmed Commerce's decision to include both
positive and negative normal-to-export price differences when
calculating weighted average dumping margins in initial dumping

---

of whether or not to use zeroing in both [antidumping
investigations and administrative reviews].") (citations
omitted).

   [6] Antidumping Proceedings: Calculation of the Weighted-
Average Dumping Margin During an Antidumping Investigation,
71 Fed. Reg. 77,722, 77,722 (Dep't Commerce Dec. 27, 2006)
(final modification); see U.S. Steel Corp. v. United States,
__ CIT __, 637 F. Supp. 2d 1199, 1210-16 (2009) (affirming the
modification), aff'd, 621 F.3d 1351 (Fed. Cir. 2010).

investigations but not when doing so in administrative reviews.[7]
These holdings addressed Commerce's explanation regarding the
inherent differences between the nature and goals of initial
investigations and subsequent administrative reviews.[8] Here,
Commerce clarifies that the reasonableness of its current
practice is additionally supported by the distinction between
the various comparison methods that Commerce may employ when

---

[7] Fischer S.A. Comercio, Industria & Agricultura v. United
States, __ CIT __, __ F. Supp. 2d __, 2012 WL 6062563, at *10-11
(Dec. 6, 2012); Camau Frozen Seafood Processing Imp. Exp. Corp.
v. United States, __ CIT __, 880 F. Supp. 2d 1348, 1354-55
(2012); Far E. New Century Corp. v. United States, __ CIT __,
867 F. Supp. 2d 1309, 1312 (2012); Grobest & I-Mei Indus.
(Vietnam) Co. v. United States, __ CIT __, 853 F. Supp. 2d 1352,
1361 (2012); Union Steel v. United States, __ CIT __, 823 F.
Supp. 2d 1346, 1358-59 (2012). A number of additional actions
challenging Commerce's practice in this regard have been stayed
pending the outcome of appeal in Union Steel. See, e.g.,
Papierfabrik August Koehler AG v. United States, No. 11-00147,
2012 WL 6136890, at *5 (CIT Dec. 10, 2012); Home Meridian Int'l,
Inc. v. United States, __ CIT __, 865 F. Supp. 2d 1311, 1331
n.33 (2012) (collecting cases).

[8] See, e.g., Union Steel, __ CIT at __, 823 F. Supp. 2d
at 1359 ("[T]he court concludes that when it comes to reviews,
which are intended to more accurately reflect commercial
reality, Commerce is permitted to unmask dumping behavior in a
way that is not necessary at the investigation stage."); 
Grobest, __ CIT at __, 853 F. Supp. 2d at 1361 (concluding that
"Commerce has offered a reasonable basis for treating
investigations and reviews differently"). See also JTEKT, 642
F.3d at 1384 (characterizing the "relevant question" as "why is
it a reasonable interpretation of the statute to zero in
administrative reviews, but not in investigations?"); Dongbu,
635 F.3d at 1370 (characterizing the issue presented as "the
reasonableness of interpreting 19 U.S.C. § 1677(35) in different
ways depending on whether the proceeding is an investigation or
an administrative review").

comparing normal values and export prices to calculate dumping
margins. See Remand Results at 10-13.

     The antidumping statute contemplates three distinct
methods that Commerce may employ when comparing normal values
and export prices to calculate dumping margins. See 19 U.S.C.
§ 1677f-1(d). Commerce may 1) compare the weighted average of
the normal values found during the relevant time period with the
weighted average of contemporaneous export prices (the "average-
to-average" comparison method), id. at § 1677f-1(d)(1)(A)(i);
2) compare the normal values of individual transactions to the
export prices of individual transactions (the "transaction-to-
transaction" comparison method), id. at § 1677f-1(d)(1)(A)(ii);
or 3) compare the weighted average of the normal values to the
export prices of individual transactions (the "average-to-
transaction" comparison method), id. at §§ 1677f-1(d)(1)(B),
1677f-1(d)(2). Commerce's recent policy modification is limited
to the average-to-average comparison method.[9]

---

[9] Calculation of the Weighted-Average Dumping Margin During
an Antidumping Investigation, 71 Fed. Reg. at 77,722
("[Commerce] will no longer make average-to-average comparisons
in investigations without providing offsets for non-dumped
comparisons."); see also Antidumping Proceedings: Calculation of
the Weighted-Average Dumping Margin and Assessment Rate in
Certain Antidumping Duty Proceedings, 77 Fed. Reg. 8101, 8101
(Dep't Commerce Feb. 14, 2012) (final modification) ("[Commerce]
will calculate weighted-average margins of dumping and
antidumping duty assessment rates in a manner which provides
offsets for non-dumped comparisons while using monthly average-
(footnote continued)

Commerce explains that when using the average-to-average comparison method, Commerce "does not determine dumping on the basis of individual, transaction-specific, U.S. prices, but rather makes the determination 'on average' for the averaging group [groupings are made by model and level of trade] within which higher prices and lower prices offset each other." Remand Results at 11. Commerce then "aggregates the comparison results from each of the averaging groups to determine the aggregate weighted-average dumping margin for a specific producer or exporter[,] [and] . . . by permitting offsets in the aggregation stage, [Commerce] determines an 'on average' aggregate amount of dumping for the numerator of the weighted-average dumping margin ratio, consistent with the manner in which [Commerce] determined the comparison results being aggregated." Id.

When using the average-to-transaction comparison method, however, rather than analyzing overall pricing behavior, Commerce examines each export transaction individually. Id. Commerce "determines the amount of dumping on the basis of individual, transaction-specific, U.S. sales prices[,] . . .

---

to-average [] comparisons in reviews . . . ."). The modification for administrative reviews was not yet in effect at the time of the review at issue here. In any event, Commerce did not employ the average-to-average comparison method in this review. See Remand Results at 11 (noting that Commerce used the average-to-transaction method in this review).

compar[ing] the export price or constructed export price for a

particular U.S. transaction with the average normal value for

the comparable model of foreign like product at the same or most

similar level of trade." Id. at 11-12.  "The result of such a

comparison evinces the amount, if any, by which the exporter or

producer sold the merchandise into the U.S. market at a price

which is less than its normal value[,] [and] . . . [t]o the

extent that the average normal value does not exceed the

individual export price or constructed export price of a

particular U.S. sale, [Commerce] does not calculate a dumping

margin for that comparison, or include an amount of dumping for

that comparison result in its aggregation of transaction-

specific dumping margins." Id. at 12.[10]

        Thus Commerce "has interpreted the application of

average-to-average comparisons to contemplate a dumping analysis

that examines the overall pricing behavior of an exporter or

producer with respect to the subject merchandise, whereas under

the average-to-transaction comparison method[] [Commerce]

continues to undertake a dumping analysis that examines the

_____

        [10] Non-dumped sales remain relevant and accounted for
because "[t]he value of any non-dumped sale is included in the
denominator of the weighted-average dumping margin while no
dumping amount for non-dumped transactions is included in the
numerator[,] [so] a greater amount of non-dumped transactions
results in a lower weighted-average dumping margin."
Id. at n.26.

pricing behavior of an exporter or producer with respect to
individual export transactions." Remand Results at 12-13.
Beyond providing for certain discrete limitations on the use of
the average-to-transaction comparison method,[11] the statute is
silent as to the particulars of when or how Commerce should
apply one or another of the different comparison methods.
See 19 U.S.C. at § 1677f-1(d).  Commerce's approach to, and
explanation for, distinguishing among these comparison methods –
based on the differences between an analysis of overall pricing
behavior and an analysis of individual export transactions – is
reasonable.  Commerce has thus sufficiently supported its policy
of including negative-value price comparisons in calculations
based on the average-to-average comparison method while
disallowing offsets for non-dumped sales when using the average-
to-transaction or the transaction-to-transaction comparison
methods.

---

[11] Commerce may employ this method in dumping investigations
only if "(i) there is a pattern of export prices (or constructed
export prices) for comparable merchandise that differ
significantly among purchasers, regions, or periods of time, and
(ii) [Commerce] explains why such differences cannot be taken
into account using [either the average-to-average or the
transaction-to-transaction method]." 19 U.S.C.
§ 1677f-1(d)(1)(B).  When employing this comparison method in
administrative reviews, Commerce must "limit its averaging of
[normal value] prices to a period not exceeding the calendar
month that corresponds most closely to the calendar month of the
individual export sale." Id. at § 1677f-1(d)(2).

Accordingly, because Commerce's determination not to aggregate the price differences of TPBI's above-normal value sales with the dumping margins of TPBI's dumped sales (while employing the average-to-transaction comparison method in this review) comports with a reasonable interpretation of the statute, this determination is affirmed. See Timken, 354 F.3d at 1342.

II.  Transactions Disregarded Rule

When constructing normal value for TPBI's merchandise, Commerce *sua sponte* changed its application of the "transactions disregarded rule"[12] in the interim between the preliminary draft and the final results of this review. Thai Plastic Bags I, __ CIT at __, 853 F. Supp. 2d at 1278.  The court granted Commerce's request for voluntary remand to allow Commerce to review its application of this rule and provide the parties with an opportunity to comment on this question. Id. at 1278-79.  In doing so, the court noted that while no provision directly addresses how to apply the transactions disregarded rule (beyond

---

[12] See 19 U.S.C. § 1677b(f)(2).  When Commerce determines that the circumstances do not permit normal value to be calculated pursuant to 19 U.S.C. § 1677b(a)(1), normal value may be constructed based on the costs of producing the subject merchandise. Id. at §§ 1677b(a)(4), 1677b(e).  When analyzing respondents' costs of production while constructing normal value under 19 U.S.C. § 1677b(e), Commerce may disregard below-market value transactions between affiliated parties. See id. at § 1677b(f)(2) (the "transactions disregarded rule").

requiring a cost adjustment for materials purchased from an
affiliated supplier below market price), Commerce's application
of the rule in the final results of this review appeared
contrary to the agency's past practice. Id. at 1279 n.23.[13]

On remand, Commerce determined that its application of
the transactions disregarded rule in both the preliminary and
the final results of this review was contrary to past agency
practice, resulting in inaccurate dumping margins. Remand
Results at 18.  Commerce therefore decided to apply the rule in
a manner that is consistent with agency practice. Id.[14]

---

[13] (citing Certain Pasta from Italy, 69 Fed. Reg. 6255
(Dep't Commerce Feb. 10, 2004) (notice of final results of the
sixth administrative review of the antidumping duty order and
determination not to revoke in part) and accompanying Issues and
Decision Mem., A-475-818, ARP 01-02 (Feb. 3, 2004) at cmt. 32).

[14] TPBI argues that Commerce fails to cite to any relevant
prior practice because it refers to proceedings where Commerce
applied the major input rule, 19 U.S.C. § 1677b(f)(3), rather
than the transactions disregarded rule, id. at § 1677b(f)(2).
TPBI's Br. at 13 n.2.  But TPBI is incorrect.  As Commerce
correctly emphasizes, Remand Results at 17, the material
difference between the major input rule and the transactions
disregarded rule is that the major input rule applies to
purchases from an affiliated input producer, whereas the
transactions disregarded rule applies when the affiliated party
did not produce the materials being sold.  Aside from this
distinction, both rules allow Commerce to make a cost adjustment
for undervalued purchases from affiliates when constructing
normal value and, for both rules, the statute is equally silent
with regard to the manner in which the resulting cost adjustment
is to be applied when constructing normal value for subject
merchandise comprised of multiple models consuming varying
amounts of the input in question. Compare 19 U.S.C.
§ 1677b(f)(2) with id. at § 1677b(f)(3).  Here, Commerce applied
(footnote continued)

Specifically, when constructing TPBI's normal value in both the
preliminary and the final results this review, Commerce
applied a single adjustment equally across all models of TPBI's
merchandise (regardless of the type of resin used in producing
the various models), even though Commerce found that only one of
the three types of materially different resin inputs purchased
by TPBI during the period of review was purchased from an
affiliate below market value. See id. at 29.

        In the Remand Results, on the other hand, Commerce
determined that, because "the amount and type of inputs that are
used to produce a [plastic] bag have a direct impact on the
ultimate cost to produce that bag, and the ultimate price paid
to purchase that bag," id. at 28, and because "the inputs were
used by TPBI in significantly varying quantities in producing
different types of bags during the period of review," id., it
was more accurate to adjust each model's cost data based on each
model's consumption of the one type of resin found to have been
acquired below market value, consistent with past agency
practice. Id. at 30 (explaining that "[t]his analysis is more
accurate and specific than that applied in either the
Preliminary Results or the Final Results, and is consistent with

----

the transactions disregarded rule rather than the major input
rule because TPBI's affiliate did not produce the resin sold in
the transactions at issue. Remand Results at 14 n.28.

[Commerce]'s practice in applying the transactions disregarded rule to products with significant inputs where these significant inputs are consumed in disproportionate quantities in the production of the different products subject to review").[15]

TPBI objects to Commerce's application of the transactions disregarded rule in the Remand Results, arguing that "Commerce has deprived TPBI of a fair and reasonable opportunity to present its views on Commerce's analysis in the Final Results." TPBI's Br. at 12.[16] But Commerce presented its reasoning with regard to this issue in its proposed draft remand determination, which the agency released for the parties' consideration prior to finalizing the Remand Results. Nothing prevented TPBI, when commenting on the draft remand determination, from arguing that Commerce's approach in the preliminary or final results of this review was superior to that proposed in the draft remand determination. See Remand Results at 27. TPBI made no such arguments. Id.

---

[15] To effectuate this application of the transactions disregarded rule, Commerce requested additional information from TPBI, which TPBI promptly provided. Id. at 15-16.

[16] (citing Zenith Elecs. Corp. v. United States, 12 CIT 932, 699 F. Supp. 296 (1988) (preliminarily enjoining Commerce from altering instructions concerning the cash deposits of estimated antidumping duties pending litigation of the final results of an antidumping proceeding)).

TPBI also objects to Commerce's request of additional
information from TPBI during the remand proceeding. TPBI's Br.
at 12-13.  TPBI argues that, by requesting this information,
Commerce violated the court's remand order. Id. at 13.  The
court's remand order granted Commerce's request for a voluntary
remand "to reconsider its position" with regard to its
application of the transactions disregarded rule in this
review.[17]  Having obtained the court's permission to reconsider
its application of the transactions disregarded rule, Commerce
exercised its inherent discretion to request additional
information within TPBI's possession that was reasonably
necessary to permit the agency to apply the rule with greater
accuracy and consistency. See Remand Results at 15-16, 30; NSK
Corp. v. United States, __ CIT __, 774 F. Supp. 2d 1296, 1298
n.4 (2011) (noting that agencies have "inherent discretion to
reopen the record" with respect to issues remanded for
reconsideration); Habas Sinai ve Tibbi Gazlar Istihsal
Endustrisi A.S. v. United States, __ CIT __, 625 F. Supp. 2d

----

[17] Thai Plastic Bags I, __ CIT at __, 853 F. Supp. 2d
at 1278-79 ("As an agency may request a remand to reconsider its
position, the court will remand this issue . . . .") (emphasis
added) (citing SKF USA, Inc. v. United States, 254 F.3d 1022,
1028 (Fed. Cir. 2001)); see also Def.'s Resp. in Opp'n to Pls.'
Rule 56.2 Mots. for J. Upon the Agency R., ECF No. 67, at 43
(requesting a voluntary remand to, inter alia, "reconsider
[Commerce's] analysis in applying the transactions disregarded
rule").

1339, 1356 n.18 (2009) (noting that, "[a]lthough Commerce is not

being expressly required to reopen the administrative record

[with regard to the remanded issue], the agency clearly has the

discretion to do so if appropriate").

Commerce's explanation for applying 19 U.S.C.

§ 1677b(f)(2) more precisely on remand, resulting in greater

accuracy and consistency with prior agency practice, is

reasonable.  Accordingly, the Remand Results are affirmed on

this issue.

### CONCLUSION

For all of the foregoing reasons, Commerce's Remand

Results are affirmed.  Judgment will be entered accordingly.


                                    __/s/ Donald C. Pogue_____
                                    Donald C. Pogue, Chief Judge


Dated: February 11, 2013
       New York, NY

UNITED STATES COURT OF INTERNATIONAL TRADE

THAI PLASTIC BAGS INDUSTRIES CO.,
LTD.,

        Plaintiff,

           v.

UNITED STATES,

        Defendant,

          and

POLYETHYLENE RETAIL CARRIER BAG
COMMITTEE, HILEX POLY CO., LLC, and
SUPERBAG CORPORATION,

        Defendant-Intervenors.

Before: Donald C. Pogue,
       Chief Judge

Consol. Court No. 11-00086

JUDGMENT

    This case having been duly submitted for decision; and the court, after due deliberation, having rendered a decision herein; Now therefore, in conformity with said decision, it is hereby

    ORDERED, ADJUDGED and DECREED that Polyethylene Retail Carrier Bags from Thailand, 76 Fed. Reg. 12,700 (Dep't Commerce Mar. 8, 2011) (final results of antidumping duty administrative review), as modified by the Results of Redetermination Pursuant to Court Remand, ECF No. 92, is AFFIRMED.

                        /s/  Donald C. Pogue
                     Donald C. Pogue, Chief Judge

Dated:    February 11, 2013
          New York, New York